Laramore, Judge,
delivered the opinion of the court:
This is a claim for officer’s retirement pay based upon an alleged disability incurred in or aggravated by active service in the Army of the United States, during the period of July 24,1942, date of induction, to June 17,1946, the date of release from active duty as a Captain.
To recover the plaintiff must show that he was, in fact, disabled at the time of his release. Since the Army Board for the Correction of Military Records was the first board clothed with authority to so find, his task is to show that the Board’s decision in denying his application for correction of his records was arbitrary, capricious, erroneous in law, or not supported by substantial evidence.
The facts are summarized as follows: In June of 1928 plaintiff entered the Federal civil service as a Post Office Department Mail Clerk, where he was continuously employed up to July 24,1942, when he entered upon active duty as an enlisted man. The record discloses that plaintiff liked his work in the postal service and was given high performance ratings up to the time of his induction into the Army. He was well liked by his fellow employees and participated in the activities of the office.[1]
Plaintiff’s physical examination for induction into military service showed that he was physically qualified for active military service. He entered upon active duty in the Army of the United States on July 24,1942. On December 1,1942, *550 plaintiff was examined for Army Officers’ Candidate School and was found to be physically qualified.
Prior to his appointment as a Second Lieutenant, plaintiff served on active duty as an enlisted man. His character was rated as excellent, his efficiency rated as superior, and his physical condition when discharged from enlisted service was good.
On May 4, 1943, the day following his discharge from enlisted service, plaintiff, having successfully completed the course at the Adjutant General’s Officers’ Candidate School, accepted appointment as a Second Lieutenant, A.U.S. He continued on active duty until his separation, not by reason of physical disability, in the rank of Captain, on June 17, 1946, from Rhoads General Hospital, Utica, New York.
Plaintiff served overseas for approximately two years and four months, and was credited with combat service in the Naples-Foggia, Rome-Amo, and Northern Apennines areas. During almost all this period plaintiff’s assignment was that of a courier transfer officer. His duties included the transmission of Army and diplomatic top secret, confidential, and cryptographic material which required extraordinary safe and expeditious handling. He took his responsibility seriously and worked diligently.[2] Some of the areas where plaintiff was stationed underwent bombing attacks with the result that plaintiff was under some stress at all times.
On August 17, 1944, a medical installation in Italy made up a medical card on plaintiff, as follows: “Under observation, undiagnosed, Line of Duty: Yes * * He was then transferred to the 61st Station Hospital, Foggia, Italy. Upon admission to the hospital, the recorded history included the following:
C.O. General aches and pains fever and chilly sensations onset — 3 or 4 days ago noticed he wasn’t feeling good— Yesterday he was in bed and woke up with terrific pain in back. No history of [one illegible word].
*551 Several progress notes were entered:
19-8-44 [August 19, 1944] No fever — but still com-of in back.
22-8-44 General condition much improved. No pain or fever.
23-8-44 Evidence of spasticity of colon — Barium enema.
3-9-44 General condition good. He has been working 7 days a week. I feel he needs some form of relaxation. [Emphasis supplied.]
This entry in plaintiff’s medical record contains the first indication that plaintiff had become disabled by reason of a nervous or “mental” condition. Plaintiff’s medical witness, a psychiatrist, fixed that day as the approximate date on which plaintiff’s disability had its onset. Defendant’s medical witness, also a psychiatrist, testified that the important question in such cases is “at what point the symptoms appeared.” At that date in 1944 plaintiff had been on active duty for approximately 25 months and on overseas duty for approximately 11 months.
Later, in February of 1945, plaintiff was admitted to the Twenty-fourth General Hospital, Florence, Italy, under a diagnosis of “Obs. peptic ulcer. Line of duty: Yes.” The record indicates that the examining physician found that plaintiff had a nervous stomach.
On June 23, 1945, plaintiff was admitted .to the Eighth General Dispensary in Italy where, among others, the following entries were made:
24 June 45 — Varicosities—legs—post aspect — Bilateral — Mod Severe — C.U. Entered Service 22 July 1942— varicosities present. Progressively worse for 2 yrs. with symptoms — Other complaints — Sinusitis and neurosis gastro-intestinal — moderate. 24 Gen Hosp-1945— March 2 — suggest Hospitalization Evaluation findings and complaints.
24 June 45 — Headaches probably psychogenic. Feels necessary to exert great effort to do work or take part in sports; tires easily. Problem explained to him. * * * [3]
*552 On June 27,1945, plaintiff was transferred to the Thirty-second Station Hospital, Caserta, Italy, where he remained until July 6, 1945. Captain J. W. Robertson, M.C., a psychiatrist, reported in part as follows:
During first interview he had no complaint of nervousness but on being seen the second time, states that for a long time he has had some fuss [or “fears”] in deciding minor actions and complains of nervous .tension. He has started to worry over himself to an undue extent. Feeling that he is becoming “nervous in the service.” At present time has no disabling nervousness that is incompatible with full duty, but is suggestible and has been “reading up.”
Diag. Anxiety state mild with hypochondriases.
Other entries were:
6-7-45. * * * Psychiatrist feels that to operate veins will increase the psychiatric part of this picture. To be returned to Duty.
Final diagnosis:
1. Varicosities * * * moderate. C.U.
2. Varicosities * * * mild. C.U.
Additional diagnoses * * *
Anxiety state mild with hypochondriasis LOD yes. Line of duty 1 & 2 No EPTS.
Varicose veins — mild posterior, both legs, were recorded in the report of physical examination for induction although they were not noted in a later examination report dated December 1, 1942, for Army Officers’ Candidate School. The report of hospitalization during service in June-July 1945 contains the first reference to any real trouble with varicose veins. Surgery at the Rhoads General Hospital followed about a year later.
From September 30, 1945 to October 4, 1945 plaintiff was in the Three Hundredth General Hospital, Naples, Italy, prior to boarding ship December 17, 1945, for return to the United States. Medical entries at the hospital included: “FINAL DIAGNOSIS: Hypochondriasis-chr-mod sv. * * *. His duties are quite light & he should be able to do them.”
Plaintiff became ill aboard ship on the return voyage to the United States, and after return, on December 30, 1945, *553 was transferred to Camp Patrick Henry Station Hospital, Virginia. He was returned to duty on January 5,1946.
On terminal physical examination of plaintiff at the Separation Center, Fort Dix, New Jersey, on January 9, 1946, the following entry, among others, was made:
32. VARICOSE VEINS bilateral severe EPTS AMS symptomatic
$ * * * *
52. REMARKS ON ITEMS NOT SUFFICIENTLY DESCRIBED:
* * * 48 [PSYGHIATRIC] Anxiety reaction, moderate, non-transient, manifested by symptoma-tology without organic basis gastro-intestinal preoccupation, tension, tremulousness, uselessness. Stress moderate (12 months Combat Zone). Physical examination disposition mild, disability mild, prognosis good.
$ $ $ $ :&
54. IS INDIVIDUAL PERMANENTLY INCAPACITATED FOR GENERAL SERVICE? Yes. LIMITED SERVICE? Yes.
55. If incapacitated for general or limited service state reason — Anxiety reaction — moderate—non-transient.
Plaintiff was found to be permanently incapacitated for both general service and limited service by reason of “anxiety reaction — moderate—non-transient,” but no corrective measures or other actions were recommended and he was not taken before any medical board. As a matter of fact, as shown by the evidence, corrective surgery was not performed on plaintiff’s varicose veins in 1945 because the Army psychiatrist felt that “* * * to operate veins will increase the psychiatric part of the picture.” He was separated from active service, not by reason of physical disability, and placed on terminal leave.
On March 4, 1946, plaintiff was admitted to the Army’s Rhoads General Hospital as a direct casual from terminal leave. A surgeon, Major Orrin J; VanDyk, M.O., who had the management of plaintiff’s case, did surgery, on both sides for the varicose veins. Dr. VanDyk and other Army medical officers at the hospital were aware of plaintiff’s “mental *554 set-up.” At least one medical officer suggested that plaintiff be seen by a psychiatrist. The record fails to show, however, that plaintiff was given either psychiatric treatment or a psychiatric interview. The hospital was in the process of closing while plaintiff was a patient there. The last entry in plaintiff’s medical record there is dated June 17,1946, and on June 30,1946 it disposed of its last patient.
Dr. VanDyk, the surgeon, found double hernias, but he rejected surgery “in view of this pt’s mental set-up.” Plaintiff had been found to have no hernia at the time of induction examination on July 24,1942, and at the time of his physical examination on December 1,1942 for Army Officers’ Candidate School.
At about the time of his release from active duty on June 17,1946, plaintiff began seeing doctors. He first was treated by a private physician in Utica, New York. The doctor recommended psychiatric treatment, and the Veterans Administration supplied i't. Since his release from active duty, plaintiff has undergone much treatment by private and Veterans Administration doctors and a number of operations which the Veterans Administration authorized. He is still under the care of Veterans Administration psychiatrists and other doctors, and he is on a special diet.
Effective the day of separation from service, plaintiff was awarded a combined service-connected rating of 40 percent by the Veterans Administration. His current combined rating by Veterans Administration is 50 percent.
At about the time of the expiration of his terminal leave in June of 1946 plaintiff returned to work at his former position in the Post Office at Utica, New York. He found it difficult to do his work, was temperamental, listless and irritable. He was unable to cope with his problems and was sick most of the time. He made application for retirement from civil service and on August 6,1948 was given a medical examination by an officer of the Army Medical Corps. The examiner reported, among other things, the following findings:
DIAGNOSIS: Psychoneurosis severe.
CONCLUSION: It is the opinion of the undersigned that the applicant is totally disabled for useful & *555 efficient service — That this disability is not due to intemperance vicious habits venereal disease, or willful misconduct — The exact date at which such disability began can not be stated.
As a result of these findings plaintiff was retired from the Federal civil service, Post Office Department, in October of 1948, because of physical disability, effective June 1, 1947. Except for the short period following his release from the Army, when he attempted to work at his former job in the Post Office Department, plaintiff has not been employed.
After suit had been filed herein, the Correction Board, on July 16, 1958, granted a hearing. Dr. Joseph D. Franzoni, a former Army psychiatrist, who had exhaustively studied plaintiff’s history and records, appeared as a witness for his patient, the applicant. The doctor testified that plaintiff’s mental disability was service-incurred and that the disability was “real and permanent.” However, plaintiff’s application was denied. At the hearing in 1958, no witness was presented by the Army. No one in the Surgeon General’s Office has at any time seen or examined plaintiff.
Thus it can be seen from the entire record that prior to induction plaintiff was both mentally and physically fit. His record upon entry into the Army showed him to be fit. His examination for Army Officers’ Candidate School showed him to be fit. His medical history in the Army showed that gradually he became more and more mentally and physically disabled and when examined for release from the Army he was found to be unfit for both general service and limited duty. Almost immediately thereafter he was retired from Civil Service for the reason that he was totally disabled for useful and efficient service. Furthermore, the record discloses that prior to his release from the Army, and after, plaintiff has been treated for both mental and physical disorders. The record further discloses that plaintiff then suffered, and now suffers, from a disabling mental and physical condition. This was disclosed by the testimony of an eminently qualified former Army psychiatrist who not only examined plaintiff but also made a complete study of plaintiff’s medical record.
*556 In opposition to this defendant produced but one witness, a Colonel Glass, an Army psychiatrist, who testified only from a study of plaintiff’s medical records.
Couple the above facts with the Army regulations then in effect. What do you have? A.R. 40-1025 provides, in part, as follows:
SECTION in
ENTRIES REQUIRED ON INDIVIDUAL MEDICAL RECORDS
63. LINE OF DUTY FOR DISEASE OR INJURY. — * * *
b. Basic provision for determining line of duty. — A disease or injury that a militarized person contracts or sustains, while in the active military service of the United States, will be presumed to have been incurred in line of duty? unless there is substantial evidence to show that such disease or injury— * * *
(4) Existed prior to the individual’s current active service and was not aggravated by the service (g below).
g. General inference. — Lacking evidence to the contrary, a disease or injury of a militarized person will be presumed to have been service-connected, and, therefore, in line of duty. * * *
g. Existed prior to individual’s current active service and was not aggravated by service (EPTS).
(1) General. — If none of the factors mentioned above, from d through /, is involved, the line of duty will be determined on the basis of whether or not the disease or injury, or the conditions responsible for the disease, injury, or death, existed prior to active service, and, if such did exist prior to active service, whether or not they were aggravated by the active service. The following basic provision ((2) below) will be taken as the fundamental guide in establishing line of duty in such instances.
(2) Basic provision. — Irrespective of length of service, an Army patient will be presumed to have been in sound condition, upon entering active service, unless the disease or injury, or the conditions which brought about the disease, injury, or death, were noted on the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below) demonstrates that the injury or disease, or the conditions which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service. Fur *557 ther, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well-established medical principles, are able to overcome the presumption of service-aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. (It will be borne in mind that in determining line of duty with respect to eligibility for retirement benefits, the incapacity, whether resulting from a condition incident to service, or from a condition that existed prior to service but aggravated by the service beyond the “natural progress” of the condition, must be permanent; that is, the incapacity caused by the condition must be such that the removal of the disability within a reasonable time is highly improbable; see AR 605-250 and AR 615-395.)
(3) Clear and unmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles., will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. * * *
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. * * * [Advancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and bronchial asthma (not established as seasonal) can be expected to have been caused by exertion, exposure or other adverse influence of the military service.
5. Psychiatric cases.
(a) In line of duty. — The following cases will be considered to be in line of duty irrespective of length of service:
1. Cases of * * * psychoneurosis occurring in individuals in whom no evidence of the disorder in question existed prior to entry in service.
2. Cases of * * * psychoneurosis occurring in individuals in whom predisposition to these diseases, but not the actual disease itself, existed prior to entry in the service. * * *
3. Psychiatric conditions occurring in individuals in whom such conditions existed prior to entry into the service, but where there is evidence to show that *558 the disorder has been aggravated by the service. * * *
(b) Not in Tme of duty: — The following cases will be considered to be not in line of duty: cases of * * * psychoneurosis where available evidence clearly indicates the existence of the disease prior to entry into the service, and that the disease was not aggravated by the service.
In the instant case, plaintiff’s medical history shows that he was not suffering from any disease at the time of his induction into the Army. All his records indicate that anything mentally or physically wrong was incurred in line of duty and not within the exceptions noted in A.R. 40-1025, supra. Moreover, plaintiff’s physical examination showed no impairment under A.R. 40-105, which delineates physical qualifications for commission. However, at the time of his release, the terminal physical examination of plaintiff showed that he was unfit for general service or limited duty.
Having found that as a result of physical impairment plaintiff was unfit for duty, A.R. 40-1025 provides that “medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service.” In this case, established medical principles are entirely lacking to rebut the presumption that plaintiff was sound at the time of his induction.
The same principle under A.R.. 40-1025 applies to the presumption relative to service aggravation. Moreover, A.R. 600-140 provides that injury or disease is presumed to have been incurred in line of duty except under certain conditions. Plaintiff’s disease does not come within the exceptions noted therein.
Furthermore, War Department Technical Manual 12-245 provides, in part, as follows:
(2) * * * [A]n officer is permanently incapacitated for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. * * *
*559 Thus, we have a man found physically qualified for induction and physically qualified for Officers’ Candidate School. He then becomes disqualified for reasons both mental and physical, incurred while in the service and in line of duty. After plaintiff’s petition was filed in this court, plaintiff was permitted to appear before the Army Board for Correction of Military Records on July 16, 1958. All these facts were before the Army Board for Correction of Military Records and in spite of this the Board denied plaintiff’s application. We think this denial was arbitrary and not supported by substantial evidence. Plaintiff is entitled to physical disability retired pay in the rank of Captain, based upon disabilities incurred in or aggravated by active service in the Army of the United States, from June 17,1946, the date of his release from active duty, less amounts received from the Veterans Administration. The amount of recovery will be determined under Rule 47 (c) (2) of the Rules of this court.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows [4]:
1. This is a claim for officer’s retirement pay based upon disability incurred in or aggravated by active service in the Army of the United States during the period from July 24, 1942, date of induction, to June 17, 1946, the date of release from active duty as a captain. Plaintiff, born February 10, 1909, entered the Federal civil service, as a mail clerk, Post Office Department, in June 1928, and, with the exception of his period of military service, was continuously employed in that agency until he was retired, because of physical disability. The medical examination conducted August 6, 1948, carried a diagnosis of psychoneurosis severe. The examining physician expressed the opinion that plaintiff was “totally disabled for useful and efficient service” and that the disa *560 bility was not due to intemperance, vicious habits, venereal disease, or misconduct. The actual determination of entitlement to the benefits of civil service retirement was made in October 1948, to be effective June 1,1947, from which earlier date he has received retirement pay. He has also been awarded disability compensation by the Veterans Administration on the basis of service connection allowed for anxiety reaction, varicose veins, duodenal ulcer, and hernia.
2. Plaintiff liked his work as a Post Office Department clerk, which included handling registered mail, and he was given high performance ratings up to the time of his induction into the Army. He was a good worker and well liked by his fellow employees. Plaintiff testified that, prior to his induction, he “went with a group” and participated in sports, including football and baseball.
At a hearing before the Army Board for Correction of Military Records two statements were introduced. The first statement, dated July 10, 1958, and signed by the Superintendent of Mails, Utica, New York, is as follows:
This is to advise that Raymond Bevans [sic] was a fellow employee of mine at the Utica, N.Y. Post Office for several years. Before entering the Military Service, he was a very good worker and well liked by the other men. To the best of my knowledge any illness that Mr. Bevans [sic] may have had previous to entering the Military Service did not affect either his temperament or the quality of his work.
Upon returning from the Military Service, M. Bevans [sic] was listless, temperamental and did not seem to be able to maintain even the minimum work standards required of a clerk.
A second statement, dated February 10,1958, over the signature of a foreman at the Post Office, Utica, New York, was as follows:
In reference to Mr. Raymond Bevins, it was my pleasure to work & supervise with him for many years prior to and after his Service in the Army.
Ray was a first class Post Office clerk and a very pleasant & friendly person.
After returning from service he seemed to be irritable and unable to cope with his problems and was sick most of the time prior to his retirement.
*561 Apart from statements attributed to plaintiff in various medical reports and bis recorded testimony, the foregoing statements comprise the only evidence in the record concerning plaintiff before he entered upon active duty.
3. Report of physical examination for induction into the military service resulted in the following findings, among others:
1. Eye abnormalties — none.
6. Vericose veins — Mild posterior, both legs, N.D.
7. Hernia — none.
11. Musculo-skeletal defects — none.
12. Abdominal viscera — normal.
13. Cardiovascular system — normal.
15. Nervous system; reflexes, pupillary — normal—patel-lar — normal.
16. Endocrine disturbances — none.
17. Results of laboratory examinations, when made— Serology negative. Prostatic smear shows no pus cells or organisms.
He was found to be “mentally and physically qualified for the active military service of the United States,” and entered upon active duty in the Army of the United States on July 24,1942.
4. On December 1,1942, plaintiff was examined for Army Officers’ Candidate School and the following entries, among others, were made in the report:
3. Nature of examination OFFICERS’ CAND. SCH. Army Postal * * *.
7. Medical history — Usual childhood diseases, no se-quelae. Fracture left clavicle — 1918. * * *
8. Eyes — Normal.
14. Cardiovascular system: Heart — Normal * * * Pulse: * * * Full and Regular * * * Varicose veins— None.
17. * * * Endocrine system — Normal.
18. Bones, joints, and muscles — No deformity of left collarbone. * * *
19. Abdominal viscera — Normal.
20. Hernia — None * * *
21. Genito-urinary system — Normal.
22. Nervous system — Normal.
23. Laboratory procedures: Kahn — Negative—Wasser-man — Not indicated— * * * Microscopical (if indicated) — Normal * * *.
*562 26. Is the individual permanently incapacited for active service? No. If yes, specify defect-.
27. If applicant for appointment: Does he meet physical requirements? Yes. * * *
The report was signed by three officers of the Army Medical Corps.
5. Plaintiff served on active duty as an enlisted man from July 24, 1942, through May 3, 1943. He was awarded the Good Conduct Medal. His character was rated as excellent, his efficiency rated as superior, and physical condition when discharged from enlisted service was good.
On the day following his discharge, May 4, 1943, having successfully completed the course at the Adjutant General’s Officers’ Candidate School, plaintiff accepted appointment as second lieutenant, A.U.S., and continued on active duty until his separation, not by reason of physical disability, with the rank of captain, on June 17, 1946, from Rhoads General Hospital, Utica, New York.
6. Plaintiff served overseas for a period of approximately two years and four months, and was credited with combat service in the Naples-Foggia, Rome-Arno, and Northern Apennines areas. He was awarded the American Service Medal, the European African Middle Eastern Service Medal, the European Campaign Medal with three bronze service stars, the Meritorious Service Unit Plaque, and the World War II Victory Medal.
7. During almost the entire period of overseas service plaintiff’s assignment was that of a courier transfer officer. He was stationed at airfields at or near Naples, Foggia, and elsewhere. Plaintiff was never assigned or attached to 5th Army Pleadquarters but he was, in the course of performing his duties, in close proximity to that Army Headquarters. Plaintiff testified that some of the areas or airfields where he was stationed underwent bombing attacks by the enemy. He supervised the transmission of Army and diplomatic top secret, confidential, and cryptographic material. He handled code books, cryptographic materials, top secret documents of an urgent character which required extraordinarily safe and expeditious handling. Pie handled mail only if it had been formally certified as entitled to Army courier service. *563 Sometimes, he personally carried the material from one headquarters to another. This included messages or orders from General Marshall in the United States for General Clark in Italy. For the last month or so in 1945, prior to being returned to the United States for demobilization, he worked in the postal directory service.
At the hearing before the Army Board for Correction of Military Records, July 16,1958, there occurred the following exchange:
Executive Seceetaey. If I may. Mr. Bevins, relative to the work you did in the Army, carrying these matters, that, of course, had some security classification, did that type of work concern you more than you feel it should have, because of the crucialness of the type of work you were doing ?
ApplicaNt. I would say I always was under the impression that if you lose a piece, you may as well be missing; and I have seen the times when I actually slept with those pouches, where we were in places where we could not afford security measures required by Army Regulation.
Executive Seceetaey. Did that worry you?
Applicant. It certainly did at times, because I knew I was personally responsible for that material, and that I lived with it.
Executive Seceetaey. Let me put it another way: Do you think it preyed on your mind more than possibly it should have?
Applicant. I don’t know about that, but I certainly was very much concerned about it at all times, because I knew the importance of it. It did give me concern; yes, sir.
Executive Seceetaey. Do you think your physical symptoms had any relationship possibly to your concern over the type work you were doing and your ability to do the work properly ?
Applicant. There was no concern over my ability to-do the work properly, but I was always concerned about the possibility of something going wrong. * * *
Plaintiff took his responsibilities seriously, and worked diligently. On September 3,1944, a medical officer recorded in the record of plaintiff at the Sixty-first Station Hospital, Foggia, Italy: “He has been working I days a week. I feel he needs some form of relaxation.”
*564 At the hearing by the Army Board for Correction of Military Records, there occurred the following exchange between plaintiff’s counsel and Dr. Joseph D. Franzoni, a psychiatrist testifying in plaintiff’s behalf:
Counsel. Do you have any comment as to whether or not the type of his duties might have contributed to his condition which became, certainly, manifest in 1946 while he was in the Army ?
WitNess. Yes, I believe that the nature of his duties had a great deal to do with the development of this condition of his. His position certainly was one of responsibility, and he certainly was required to be more careful than in any of his other previous assignments, like, for instance, registered mail, because he knew the nature of the material being transmitted that was under his direct control. And, of course, how much responsibility or tension any person can assume and maintain varies from person to person. Each person has his breaking point, and it has to be individually determined for each one. I would also point out to the Board a rather significant thing: He was one of six courier officers in the ETO. So they were few and far between; and by the nature of his duties he had to be more or less a lone wolf and stay by himself with the exception of apparently the few enlisted men under his direction, under his command; so he did not have the usual associations, the support that the average person has. Man is a gregarious animal, and we have unit-identification, and that sustains morale. * * *
At the Thirty-second Station Hospital, Caserta, Italy, in June 1945, one Capt. J. W. Robertson, M.C., a psychiatrist, reported that he had a feeling that plaintiff, a patient, was “becoming nervous in the service.”
8. On August 17, 1944, a medical installation, AFAD No. 53, in Italy, made up a medical card on plaintiff: “Under observation, undiagnosed, Line of Duty: Yes. * * * Disposition : Sixty-first Station Hosp.” On the same day plaintiff was admitted to the Sixty-first Station Hospital, Foggia, Italy, where he was retained until returned to duty on September 3, 1944. Upon admission to the Sixty-first Station Hospital, the recorded history included the following:
O.O. General aches and pains fever and chilly sensations onset — 3 or 4 days ago noticed he wasn’t feeling *565 good — Yesterday he was in bed and woke up with terrific pain in back. No history of [one illegible word]
Several progress notes were entered:
19-8-44 [August 19, 1944] No fever — but still complains of pain in back.
22-8-44 General condition much improved. No pain or fever.
23-8-44 Evidence of spasticity of colon — Barium enema.
3-9-44 General condition good. He has been working 7 days a week. I feel he needs some form of relaxation.
After several laboratory tests had been completed, the hospital, on September 3, 1944, released plaintiff to duty, with the following comment:
Diagnosis: No disease found — Administrative admission for laboratory tests for “suspected” disease of large bowel (unconfirmed).
Line of duty: Yes.
The report of hospitalization which began August 17,1944, contains the first indication in the record that plaintiff had become disabled by reason of a nervous or “mental” condition. Plaintiff’s medical witness, a psychiatrist, fixed that day as the approximate date on which plaintiff’s disability had its onset. Defendant’s medical witness, also a psychiatrist, testified that the important question in such cases is “at what point the symptoms appeared.” At that date in 1944 plaintiff had been on active duty for approximately 25 months and on overseas duty for approximately 11 months.
9. On February 19, 1945, plaintiff was admitted to the Twenty-four General Hospital, Florence, Italy, under a diagnosis “Obs. peptic ulcer. Line of duty: Yes.” From the day of admission until he was discharged on March 2, 1945, Map John J. Archinard, M.C., had the management of plaintiff’s case. Dr. Archinard ordered a number of laboratory examinations and he made, among others, the following entries in plaintiff’s record:
19 Feb/45 Admitted — History & duration suggest a purely functional disturbance.
Tentative Diagnosis: Neurosis — gastric.
*566 States his health has never been the best. Has had a finicky stomach all his life. * * * Pt. states he is nervous — has always been so — and often feels epigastric quivering when he walks into a place * * * Further inquiry reveals that he had present trouble many years. His family physician took X-rays, treated him. Told him he had a nervous stomach.
28 Feb. Pt. slightly better. The disturbance is obviously functional has existed many years. Not incapacitating. Feel he can do duty.
Final Diag: Neurosis: gastrointestinal: moderate: C.U. manifested by epigastric pain, discomfort, belching, flatulence, nervousness, sensation of quivering in abdomen. LOD yes.
2 March/45 Duty.
Prior records do not attribute to plaintiff any statements concerning history and duration of his stomach or nervous condition such as were recorded in the February 1945 medical report. When the record of this hospitalization was made, plaintiff had been on active duty for about 31 months and on overseas duty for approximately 18 months.
10. On June 23,1945, plaintiff was admitted at the Eighth General Dispensary, where, among others, the following entries were made:
24 June 45 — Varicosities—legs—post aspect — Bilateral — Mod Severe — C.U. Entered Service 22 July 1942— varicosities present. Progressively worse for 2 yrs. with symptoms — Other complaints — Sinusitis and Neurosis gastro-intestinal — moderate. 24 Gen Hosp 1945— March 2 — suggest Hospitalization Evaluation findings and complaints.
24 June 45 — Headaches probably psychogenic. Feels necessary to exert great effort to do work or take part in sports; tires easily. Problem explained to him. * * *
Plaintiff’s medical witness, Dr. Joseph D. Franzoni, in commenting on the dispensary report of June 1945, after having previously testified that plaintiff’s disability had had its onset on or about August 17,1944, indicated that plaintiff had by this later date begun to focus his tension and anxiety on his gastrointestinal system.
Dr. Joseph D. Franzoni also testified as follows:
* * * [S]ometimes a person may attempt to focus — or rather it so happens that they will tend to focus their *567 tension on one body system or organ or group of organs. He complained of headaches. There is a notation in his record that, on 23 June 1945, reads: “Headaches, probably psychogenic; feels necessary to exert great effort to do work or take part in sports; tires easily. Problem explained to him.” And he was returned to duty. Headache is frequently a psychogenic thing and there is no other demonstrable basis.
‡ ‡
* * * Now, apparently, Mr. Bevins, as it were, focused his tension and anxiety on the gastrointestinal tract. Well, on August 17, 1944 there was suspected disease of the large bowel. Just exactly what the nature of the complaint was, was not indicated here. But on 19 February 1945 there is an entry on a medical record card: Peptic ulcer, observation for; and that was the time he was admitted to the 24th General Hospital. At that time a diagnosis of Neurosis, gastrointestinal, moderate, cause undetermined, and so forth, line of duty yes, was made.
On cross-examination Dr. Franzoni testified as follows:
* * * [S]ince the operation particularly for the perforated peptic ulcer there has been apparently a shift of his psychoneurotic symptoms from a gastrointestinal to the cardiovascular system, and this frequently happens, you remove a man’s focus of a disability and he has to find another one, unconsciously, that is * * *.
11. On June 27, 1945, plaintiff was transferred from the Eight General Dispensary to the Thirty-second Station Hospital, Caserta, Italy, where he remained until July 6, 1945. Capt. J. W. Robertson, M.C., a psychiatrist, reported, in part, as follows:
During first interview he had no complaint of nervousness but on being seen the second time, states that for a long time he has had some fuss [or “fears”] in deciding minor actions and complains of nervous tension. He has started to worry over himself to an undue extent. Feeling that he is becoming “nenvous in the service.” At present time has no disabling nervousness that is incompatible with full duty, but is suggestible and has been “reading up.”
Diag. Anxiety state mild with hypochondriasis.
*568 Other entries were:
6-7-45. * * * Psychiatrist feels that to operate veins will increase the psychiatric part of this picture. To be returned to Duty.
Final diagnosis:
1. Varicosities * * * moderate. C.U.
2. Varicosities * * * mild. C.U.
Additional diagnoses * * *
Anxiety state mild with hypochondriasis LOD yes. Line of duty 1 & 2 No EPTS.
Mild varicose veins, posterior, both legs, were recorded in the report of physical examination for induction although they were not noted in a later examination report dated December 1,1942, for Army Officers Candidate School. The report of hospitalization during service in June-July 1945 contains the first reference to any real trouble with varicose veins. Surgery at the Rhoads General Hospital followed about a year later. History recorded on admission to hospital from terminal leave in March 1946 states plaintiff:
* * * has been aware of varicose veins for the past ten years * * * In civil life he had a job at the Post Office which necessitated standing long hours. The condition is progressing both legs now being involved. He believes his training at O.C.S. aggravated the condition * * *
12. On September 30, 1945, plaintiff was admitted to the Three Hundredth General Hospital, Naples, Italy, from which he was returned to duty on October 4, 1945. Medical entries made at the hospital include:
PERTINENT HISTORY: All his life he has been nervous & tense & tends to worry about his health. Had GB, GI, and Ba enema at 24 GH in 1944 — Diagnosed as Gastric Neurosis [Note: Plaintiff was in the Twenty-fourth General Hospital in February and March 1945, and not in 1944] * * * In last few wks more nervous & heart pounds “all the time” * * * Likes summer better than winter & is always cold — hand & feet stay cold & clammy * * *
FINAL DIAGNOSIS: Hypochondriasis — chi'—mod sv. LOD NO EPTS [5] Disposition Duty.
*569 3 Oct 45
All check ups neg. He was reassured & to ret to duty. This is an old mild chr hypochondriasis — -well fixed & not aggravated by military duty — His duties are quite light & he should be able to do them.[6]
With reference to plaintiff’s “mental condition,” this report, which was by a medical officer, after plaintiff had been on active duty for more than three years and on overseas duty for more than two years, is the only one in his Army records which contains a finding that the neuropsychiatric condition was not incurred in “line of duty.”
13. On December 17, 1945, plaintiff boarded the U.S.S.
Langley for return to the United States. He became ill aboard on December 27, 1945, and on December 30, 1945, with transfer diagnoses of cat fever and asthma, was sent to Camp Patrick Henry Station Hospital, Virginia. The diagnosis of asthma was never substantiated by signs or symptoms. The impression was acute nasopharyngitis L.O.D. He was returned to duty January 5,1946, after having been given E.N.T. clearance on January 3, 1946.
14. On terminal physical examination of plaintiff at the Separation Center, Fort Dix, New Jersey, January 9, 1946, the following entries, among others, were made:
12. MEDICAD HISTORY:
Bruised right elbow — Sept. 1942 — Scotfield, Ill. Obstacle course. Station Hospital — 3 weeks.
Colon trouble — Aug. 1944 — Foggia, Italy — 61st Station Hospital — hosp. 2 weeks — Again Feb. 1945— Florence, Italy 24th General Hospital — hosp. 2 weeks. — Still symptomatic. SEE 52.
32. VARICOSE VEINS bilateral severe EPTS AMS symptomatic
47. NEUROLOGICAL normal
48. PSYCHIATRIC normal. SEE 52.
*570 52. REMARKS ON ITEMS NOT SUFFICIENTLY DESCRIBED:
* * * 48 [PSYCHIATRIC] Anxiety reaction, moderate, non-transient, manifested by symptoma-tology without organic basis gastro-intestinal preoccupation, tension, tremulousness, uselessness. Stress moderate (12 months Combat Zone). Physical examination disposition mild, disability mild, prognosis good.
Diagnosis #48 concurred in by the following members of review board: [There followed signatures of three Army medical doctors.]
53. CORRECTIVE MEASURES OR OTHER ACTION RECOMMENDED:
None, eligible for separation.[7]
54. IS INDIVIDUAL PERMANENTLY INCAPACITATED FOR GENERAL SERVICE? Yes.
LIMITED SERVICE? Yes.
55. If incapacitated for general or limited service state reason — Anxiety reaction — moderate — non-transient.
Plaintiff was found to be permanently incapacitated for both general service and limited service by reason of “anxiety reaction — moderate—non-transient,” but no corrective measures or other actions were recommended and he was not taken before any medical board. He was separated from active service, not by reason of physical disability, and placed on terminal leave.
15. On March 4, 1946, plaintiff was admitted to Rhoads General Hospitl as a direct casual from terminal leave. On March 20,1946, his varicose veins were ligated. Maj. Orrin J. Van Dyk, M.C., who had the management of plaintiff’s case at Rhoads General Hospital, performed a bilateral greater saphenous ligation in the inguinal region. Subsequently, Dr. Van Dyk did further surgery:
* * * [0]n 29 Mar 46, under local anesthesia, the greater saphenous veins were ligated below the knee on each side, a posterior, incompetent perforating branch of the greater saphenous system, right thigh, was ligated above the knee, and an incompetent perforating branch *571 of the lesser saphenous system, on the left below the knee, was ligated.
16. Maj. Orrin J. Van Dyk, M.C., a surgeon, and other Army medical officers at Rhoads General Hospital were aware of plaintiffs’ “mental set-up.” One medical officer suggested that plaintiff be seen by Maj. Norman Sidney Alpert, a psychiatrist. According to plaintiff’s testimony, Major Van Dyk, who had the management of his case, advised plaintiff of the suggestion but informed plaintiff that he would not send him to a psychiatrist. It does not appear from the record that plaintiff was given psychiatric treatment or a psychiatric interview.
Rhoads General Hospital was in the process of closing while plaintiff was a patient there. The last dated entry in plaintiff’s medical record at the hospital is “Reid fr obsn & Treat 17 June 46” and on June 30, 1946, it disposed of its last patient. The “Specialties as of April 1945” at Rhoads General Hospital were: General medicine; general and orthopedic surgery.
On April 30,1946, Dr. Van Dyk recorded: “He [plaintiff] still has complaint of upperabdominal pain & gas and ‘wants to be cured.’ ” On May 1, 1946, Major Van Dyk recorded: “Pt’s abdominal complaints discussed with him. He understands it is on a functional basis & is content to return to civilian life & ‘live with himself,’ i.e., adapt to the environment & exigencies of daily life. Will wear corset and continue antispasmodic.”
In his “Final Summary” Dr. Van Dyk reported, in part:
Pt still has the complaint of abdominal pain and discomfort. He was seen in medical consultation because of this. Consultant’s opinion was that the pt’s complaints were functional, and he prescribed an antispasmodic * * *
It was explained to the patient, that his complaints were of a functional nature and that there was no organic pathology. He was told to wear his abdominal support and continue on his present medication for a period of two weeks after discharge from the hospital and see if any improvement resulted.
This patient has two relaxed inguinal rings and increase cough impulse on both sides. However, it is the opinion of this examiner that this is in no way respon *572 sible for pt’s complaints and it is not thought advisable to do anything in the way of surgery with them at this time, especially in view of this pt’s mental set-up. He is being discharged at the present time, and is considered fit for general duty. He has requested that I inform his local doctor of my findings, and I shall send him a copy of this final summary.

FINAL DIAGNOSIS:

1. Varicose veins, bilateral, lesser and greater saphenous systems, moderate, cause unknown. (Improved)
2. Ill defined condition of gastro-intestinal tract, manifested by upper and lower abdominal discomfort, more marked on the right, intermittent. (Unchanged)[8]
LOD: 1 no, EPTS; 2 yes.
At the trial, Hr. Joseph H. Franzoni, a psychiatrist, test-fying concerning plaintiff’s Exhibit 17, page 6, said:
* * * There is an indication that Major Van Dyk was aware of this patient’s emotional status because he makes the comment * * * “it is not thought advisable to do anything in the way of surgery with them at this time, especially in view of this patient’s mental set-up. He is being discharged at the present time, and is considered fit for general duty.” I have some difficulty in comprehending this choice of language in view of the known varicosities and the fact Major Van Dyk is a surgeon by preference. He considered operating on this man for hernia and declined to do so because of the patient’s mental set-up, and the presence of herina, of incipient hernia is without a waiver or at times even with a waiver one of the things that would place a man on limited service.
17. Although plaintiff had not been examined by a psychiatrist and had not appeared before a disposition board or medical board, there appears a handwritten entry, under the heading “Disposition and Date” in the records of Rhoads General Hospital as follows: “Retired 8 May 46. Reid fr obsn & Treat 17 June 46.” It is clear from the record, however, that plaintiff was never retired. A detailed abstract and final summary, dated June 3, 1946 (plaintiff’s exhibit 19), clearly shows that the words “Retired 8 May 46,” etc., *573 have been stricken and another statement substituted therefor under the heading “Disposition,” namely, “Discharged reld. fr. further obsn. & trtmt 8 May 1946. Revert to term. ly. and revert to inactive status 17 June 1946.”
18. The Rhoads General Hospital Report of Physical Examination, dated May 3, 1946, stated that plaintiff was not permanently incapacitated for general service, but the question of whether or not he was permanently incapacitated for limited service was not answered. With reference to the matter of “appointment,” there is the entry “not for appointment,” which is of no significance except to indicate that he was not making an application for appointment in the military service.
19. Solely on the basis of Army medical records, the Veterans Administration awarded plaintiff service connection for anxiety reaction, hypochondriasis, with a rating of 30 percent and for postoperative residuals of varicose veins, with a rating of 10 percent. The combined rating was 40 percent, effective June 17, 1946, the date of separation from service. Subsequent to the filing of plaintiff’s petition, the Veterans Administration increased plaintiff’s disability rating to 50 percent.
20. About the time of the expiration of his terminal leave, in June 1946, plaintiff returned to work at his former position in the Post Office at Utica, New York. He found it difficult to do his work, and the other employees had to assist him. Plaintiff’s condition became such that by June of 1947 he “couldn’t stand up over fifteen minutes at a time.” Pie had used his sick leave and annual leave and had begun to take leave without pay in the spring of 1947. He made application to the Civil Service Commission for retirement in June or July 1948. A civil service medical examination was authorized on the basis of complaints described by him as “weakness, fatigue, nervousness. Incurred in Italy while on active duty with U.S. Army. Unable to concentrate for extended period of time. Lack of co-ordination.”
21. On August 6, 1948, plaintiff was given a medical examination for civil service retirement by an officer of the *574 Army Medical Corps at Rome, New York. The examiner reported, among others, the following findings:
DIAGNOSIS: Psychonenrosis severe.
CONCLUSION: It is the opinion of the undersigned that the applicant is totally disabled for useful. & efficient service — That this disability is not due to intemperance vicious habits venereal disease, or willful misconduct — The exact date at which such disability began can not be stated.
Plaintiff was retired from the Federal civil service, Postal Service in October 1948, because of physical disability, effective June 1,1947.
22. On August 14,1950, a Veterans Administration physician at the Veterans Administration Regional Office, Syracuse, New York, made a medical examination, the second one for civil service retirement purposes. The medical examiner reported under “Diagnosis” as follows:
1. Conversion reaction, severe, characterized by somatic complaints, exhaustion, dyspnea, tenseness.
B. Stress: Minimum. Army life.
C. Premorbid Personality: Severe impairment. Schizoid makeup. High strung, unstable.
D. Estimated Incapacity: Severe. Unable to follow his occupation as post office clerk because of his concentration upon his physical complaints, his phobias and tenseness and nervousness. Economically competent.
The medical examiner reported his conclusion as follows:
Aside from the possibility of hyperthyroidism, which should be further investigated, there are no organic reasons I can discover to account for this man’s complete disability.
23. In September 1952 Veterans Administration physicians at the Regional Office, St. Petersburg, Florida, made physical examinations and gave the third “Report of Medical Examination for Civil Service Retirement.”
The diagnoses made as a result of these examinations were:
Varicose veins, both legs, mod. severe.
Pes planus, 2°, bilateral
Scars, P.O., abdomen & both inguinal regions.
Anxiety and asthenic and hysteria conversion reactions.
Arteriosclerosis, peripheral, mild.
*575 The conclusion was recorded as follows: “Considered totally disabled for useful and efficient service as post-office clerk.”
24. Between June and August of 1946 plaintiff began seeing a succession of doctors, both private and employed by the Veterans Administration. He first was seen by Dr. Vaughn Dutton, a private physician of Utica, New York, with complaints of “nervous condition and abdominal complaints, general weakness.” Dr. Dutton recommended psychiatric treatment, which was begun under Dr. Piekielniak, a Veterans Administration psychiatrist, in Utica, New York. Plaintiff’s condition apparently did not improve. In June 1947 Dr. H. L. Pender, assisted by Dr. Piekielniak, performed a “double hernia and appendix operation.” Plaintiff continued under the care of Dr. Piekielniak until December of 1948, when he went to Florida and where he was under the care of Dr. Robert A. Biles with “abdominal complaints, nervous condition, general weakness, severe headaches, constipation.” In November 1950, through authorization of the Veterans Administration, an emergency operation for perforated peptic ulcer was performed by Dr. Philip Dann of St. Petersburg, Florida. During this period and subsequently plaintiff received psychiatric treatment from the Veterans Administration. He is still under the care of Veterans Administration psychiatrists and is on a special diet.
Plaintiff was examined October 20,1951, by Dr. J. J. Wine-burgh of Utica, New York, who has furnished the following statement:
On October 20, 1951, the above veteran was examined at my office. Past history was related as follows: While in service in 1944, developed a gastrointestinal disturbance and nervousness. Symptoms were nausea, distress and pain after meals along, with irritability- and emotional upsets. In November of 1950, he was operated on for a repair of a perforated ulcer as an emergency at the Mt. Park Hospital in St. Petersburg Fla. by Dr. Philip Dann. Made a good recovery, but as time went on, gastric symptoms, such as distress and pain after meals insidiously recurred. It has been more noticeably annoying for the past years. As the result of this, B evens *576 [sic] was put on an ulcer diet, consisting of small and frequent feedings 6 to 8 times a day. He is on this diet at the present time.
In 1946, he had a bilateral ligation for 'bilateral varicose veins at the Rhodes [sic] General Hospital in Utica N. Y. by Maj. Oran VanDyke. The varicosities recurred shortly afterwards. He now ears [sic] elastic stockings on both lower extremities.
In 1947, sometimes in the Spring, he was again operated on at the Memorial Hospital in Utica NY by Dr. Harold Pender for a bilateral hemiae and an appendix. He now wears an abdominal support because of aches and pains in the lower abdomen.
General physical examination at the present time, reveals evidence of extreme nervousness, increased reflex actions, tremors, and irritability. There is considerable tenderness in the epigastric region and some tenderness all over the anterior abdomen. There is no evidence of recurrent herniae. There is present superficial varicosities on both legs from the knee down. Bevins was retired from the postal service in Utica in 1946, after 20 years service. He claims he has tried to do various jobs and gainful duties and was unable to work, because of the above symptoms. He also complains of headaches, frequent and severe, with pains in both legs.
My final diagnosis was:
1. Ulcer, peptic, recurrent, moderately severe.
2. Varicosities, bilateral, recurrent, mild.
3. Anxiety neurosis, moderate.
4. Neurocirculatory asthenia, moderate.
Dr. Barzillia R. Waldron first saw plaintiff May 21,1954. Systematic review by this physician resulted in the following diagnostic statement:
From this workup, it was felt that Mr. Bevins was suffering from (1) Probable coronary sclerosis with angina pectoris, (2) Neurocirculatory asthenia, (3) Chronic peptic ulcer.
Except for the short period following his release, when he attempted to work in the Post Office Department, plaintiff has not been employed.
25. The following Army regulations were in effect at the times indicated:
(1) AR 40-1025, dated December 12, 1944, which provides, in part, as follows:
*577 SECTION III
ENTRIES REQUIRED ON INDIVIDUAL MEDICAL RECORDS
íjí % i*: # if:
63. LINE OF DUTY FOR DISEASE OR INJURY. — * * *
b. Basic provision, for determining line of duty. — A disease or injury that a militarized person contracts or sustains, while in the active military service of the United States, will be presumed to have been incurred in line of duty, unless there is substantial evidence to show that such disease or injury— * * *
(4) Existed prior to the individual’s current active service and was not aggravated by the service (g below).
o. General inference.- — Lacking evidence to the contrary, a disease or injury of a militarized person will be presumed to have been service-connected, and, therefore, in line of duty. * * *
g. Existed prior to individual’s current active service and was not aggravated by service (EPTS).
(1) General. — If none of the factors mentioned above, from d through /, is involved, the line of duty will be determined on the basis of whether or not the disease or injury, or the conditions responsible for the disease, injury, or death, existed prior to active service, and, if such did exist prior to active service, whether or not. they were aggravated by the active service. The following basic provision ((2) below) will be taken as the fundamental guide in establishing line of duty in such instances.
(2) Basic provision. — Irrespective of length of service, an Army patient will be presumed to have been in. sound condition, upon entering active service, unless the-disease or injury, or the conditions which brought about the disease, injury, or death, were noted on the patient’s; physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below) demonstrates that the injury or disease, or the conditions-which caused the disease, injury, or death, though not-noted, existed prior to the patient’s active service. Further, even if the existence of the condition prior to-entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well-established medical principles, are-able to overcome the presumption of service-aggravated ((4) below. This provision will serve as a basis for *578 judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. (It will be borne in mind that in determining line of duty with respect to eligibility for retirement benefits, the incapacity, whether resulting from a condition incident to service, or from a condition that existed prior to service but aggravated by the service beyond the “natural progress” of the condition, must be permanent; that is, the incapacity caused by the condition must be such that the removal of the disability within a reasonable time is highly improbable; see AR 605-250 and AR 615-395.)
(3) Clear and unmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. * * *
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, imless it can be proved otherwise on the bases of well-established medical principles. * * * [AJ dvancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and broncial asthma (not established as seasonal can be expected to have been caused by exertion, exposure or other adverse influence of the military service.
5. Psychiatric cases.
(a) In Ime of duty. — The following cases will be considered to be in line of duty irrespective of length of service:
1. Cases of * * * psychoneurosis occurring in individuals in whom no evidence of the disorder in question existed prior to entry in service.
2. Cases of * * * psychoneurosis occurring in individuals in whom predisposition to these diseases, but not the actual disease itself, existed prior to entry in the service. * * *
3. Psychiatric conditions occurring in individuals in whom such conditions existed prior to entry into the service, but where there is evidence to show that the disorder has been aggravated by the service. * * *
(b) Not in line of duty, — The following cases will be considered to be not in Ime of duty: cases of * * * psy-chonerosis where available evidence clearly indicates the existence of the disease prior to entry into the serv *579 ice, and that the disease was not aggravated by the service.
(2) AR 600-140, dated February 12,1953, which provides, in part, as follows:
c. [paragraph 1] Presumptions. — Injury, disease, or death incurred by a member of the Army while on active duty, active duty for training, or during inactive-duty training, or by a cadet at the United States Military Academy, or by a member of the advanced course ROTC attending a summer camp will be presumed to haye been incurred in line of duty and not because of the member’s own misconduct.
d. Evidence required to rebut presumptions.
(1) Line of duty. — The presumption favoring line of duty may be overcome only by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death—
(a) Was proximately caused by the intentional misconduct or willful neglect of the individual (par. 2a).
(b) Occurred during a period of unauthorized absence (par. 25).
(c) Was contracted or incurred while neither on active duty nor engaged in authorized training in an active- or inactive-duty status and was not aggravated by the service (par. 2<?).
*****
e. Nature of evidence to be considered in line-of-duty and misconduct determinations.- — -In general, any evidence may be considered in making line-of-duty and misconduct determinations, with the exception that any written signed statement of a person m the Armed Forces, against his interest, relating to the origin, incur-rence, or aggravation of any injury or disease suffered by him, may not be considered in making determinations as to such injury or disease, unless he has first been advised that he. need not make such a statement and also has been advised of his rights under the Uniform Code of Military Justice, Article 31 (b).
$ $ H* $ $
c. . [paragraph 2] * * * Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon en- *580 taring active service or authorized training in an active- or inactive-duty status. In order to overcome this presumption, it must be shown by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an active- or inactive-duty status. Further, even if the foregoing presumption is overcome by such evidence, it is presumed that any additional disability or death resulting from the preexisting injury, disease, or condition was caused by service aggravation thereof. Only specific findings of “natural progress” of the preexisting injury, disease, or condition, based upon well established medical principles, as distinguished from medical judgment alone, are sufficient to overcame the presumption of service aggravation. * * *.
(1) Presumption of sound condition. — Medical judgment alone, as distinguished from well established medical principles, will not be considered the “substantial evidence” required to rebut the presumption of a member of the Army’s sound condition at the time of his entrance into active military service. Howqver, manifestation of lesions or symptoms of chronic disease, so close to the date of the patient’s entry into active service that could not have originated after such entry, constitute “substantial evidence” that the disease existed prior to the entry. Likewise, manifestation of disease within less than the required minimum incubation period after the patient’s entry into active service will be “substantial evidence” of inception prior to the service.
(2) Service aggravated condition. — Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish service aggravation. Mere recurrences of certain diseases within a short period after the patient’s entrance into active service such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish service aggravation. Also, incapaci *581 tating defects due to certain diseases, sueb as neoplasms, most endocrine disturbances, epilepsy, arteriosclerosis, and arthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to (or aggravated by service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, or thrombosis or cerebral hemorrhage, occurring while in service will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
(3) AR 40-105, October 14,1942, superseded 29 October 1946, entitled “MEDICAL DEPARTMENT— Standards of Physical Examination for Commission * * which provided, in part, as follows:
XVII. Nervous and mental disorders * * * f. Psychoneuroses: anxiety, neurasthenia, psychas-thenia, or hysteria * * *
AR 40-105, October 29, 1946, entitled “MEDICAL DEPARTMENT — Standards of Physical Examination for Commission * * which provided, in part, as follows:
SECTION XVIII. PSYCHIATRIC DISORDERS. 51. Conditions which are causes for rejection. — a * * *
b. Psychoneurotic disorders.
(1) Anxiety reactions, characterized by diffuse anxiety, lack of self-confidence, multiple and vague complaints are not acceptable. * * *
(2) Dissociative reactions, including stupor, fugues, trances, or history thereof are unacceptable. * * *
*582 c. Character and behavior disorders. * * *
(3)Immaturity reactions of marked degree are unacceptable.
Included in this group are—
(a) Emotional instability reactions characterized by excitability and ineffectiveness in dealing with minor stress.
(b) Passive-dependency reactions characterized by helplessness, indecisiveness, and a tendency to undue submissiveness.
(c) Aggressive reactions characterized by temper outbursts, irritability, stubbornness, procrastination, and passive obstructionism.
(d) * * *
(4)Acute situational maladjustment, representing a transient personality reaction to great or unusual stress in a normally stable individual. * * *
(4) AR 140-5, June 17, 1941, superseded by AR 140-5, October 27, 1949, entitled “OFFICERS’ RESERVE CORPS,” provided, in part:
10. Physical examination. — a. Of whom required.— Except where otherwise expressly provided, every applicant for appointment in the Officers’ Reserve Corps, and every Reserve officer qualifying for reappointment, retention, promotion, transfer, or active duty, as well as extensions of tour thereof, and upon relief from active duty, will be required to pass satisfactorily a physical examination of the scope prescribed by current War Department instructions.
b. Standards. — The physical standards will be those prescribed in AR 40-100 and 40-105, * * * supplemented by current War Department instructions.
(5) AR 605-10, May 26, 1944, superseded by AR 605-10, March 9, 1946, entitled “COMMISSIONED OFFICERS— Officers Appointed in the Army of the United States,” provided, in part:
BO. Physical Standards. The physical standards for appointment and promotion, for retention of commis *583 sion, and for entry upon active duty of an officer appointed in tbe Army of the United States under these regulations are those prescribed for the Officers’ Reserve Corps in AR 40-100, 40-105 and, where applicable, 40-110, all as supplemented or modified by current War Department instructions.
26. War Department Technical Manual 12-245, October 1, 1945, entitled “Physical Reclassification Retirement and Retirement Benefits for Officers,” provides, at paragraph 60a, in part, as follows:
(2) * * * [A]n officer is permanently incapacitated for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. * * *
27. In 1954, a service organization, in plaintiffs’ behalf, petitioned the Army Board for Correction of Military Records for a hearing as to his entitlement to retirement benefits. The petition was accompanied by a request that plaintiff be sent before a Physical Evaluation Board for a determination concerning his physical and mental condition at the time of separation. Both requests were denied. Appearance before the Physical Evaluation Board was denied on the ground that, at that time, it would be practically impossible to determine plaintiff’s condition as of 1946. The Office of the Surgeon General of the Army, on December 7, 1954, had stated that, although plaintiff did have at the time of separation “a rateable disability,” according to the Veterans Administration Schedule for Rating Disabilities, “it was not of such degree as to render him unfit for further military service under the rules, regulations, and policies then in effect.”
28. After plaintiff’s petition was filed in this court, plaintiff was permitted to appear before the Army Board for Correction of Military Records on July 16,1958.
At the hearing before the Correction Board, Joseph D. Franzoni, M.D., an expert medical witness, appeared in behalf of plaintiff. He also testified at the trial in this court as a medical expert. Dr. Franzoni’s medical specialty is psychiatry. He was an intern in psychiatry and a psychi *584 atric resident at St. Elizabeths Hospital, Washington, D.C., prior to World War II. From October 1947 to April 1954, he was psychiatric resident and assistant chief of the neuro-psychiatric service at St. Elizabeths Hospital. He has also engaged in the private practice of psychiatry in Washington, D.C. On February 1, 1956, he opened the Pitt County Mental Health Clinic in Greenville, North Carolina, and he is now its director and psychiatrist.
Dr. Franzoni was an Army psychiatrist from October 1944 to October 1947. He had duty in the Neuropsychiatric Service, Newton D. Baker General Hospital, becoming Assistant Chief of the Neuropsychiatric Service. As a psychiatrist, he made appropriate appraisals of the record entries, conducted interviews and examinations as well as making diagnoses where indicated. At the time of his release from active duty in the Army, Dr. Franzoni was Chief of the Neuropsychdatric Section, Station Hospital, Fort Belvoir, Virginia.
29. When Dr. Franzoni testified before the Army Board for Correction of Military Records, he had studied all of the records which the Army had made available, the information which he and Dr. Benjamin Karpman had obtained from Civil Service and private physicians, and the Veterans Administration records. Dr. Karpman, former Chief Psychotherapist of St. Elizabeths Hospital, had sent his patient, the plaintiff, to Dr. Franzoni for psychiatric consultation sessions and for physical and neurological examinations in October 1955. Dr. Franzoni, after conducting physical and neurological examinations of plaintiff, had psychiatric consultations (including a basic interview) with plaintiff, treating him and renewing plaintiffs’ medical prescriptions. He had had an interview with Dr. John W. Walsh, Chief Medical Officer in the Veterans Administration Contact Office, Washington, D.C. Army medical records, Veterans Administration medical records, Civil Service medical records, and reports of private physicians were before the Correction Board on the day of the hearing, July 16, 1958.
At he hearing before the Army Board for Correction of Military Records, Dr. Franzoni testified, in part, that, in •his opinion, plaintiff was on that date, the day of the hearing *585 before the Correction Board, suffering from chronic anxiety reaction, of moderate intensity; that plaintiff was suffering from substantially the same condition (taking into account variations in nomenclature) on January 9,1946, at the Separation Center, Fort Dix, New Jersey, and during the months of March, April, May, and June 1946; that, during the period of January through June 1946, plaintiff was permanently incapacitated for both general and limited service; that he would fix August 17, 1944, as the date of the onset of his disability symptom complex (when there occurred the first onset of his concern for his health and his attempt to get treatment for what he thought to be his physical condition); that the condition, therefore, began while plaintiff was on active duty in the service; that he had found no medical entry of any reported symptom or manifestation which predated the entry of August 17,1944; and that, although plaintiff was at the time of the Correction Board hearing, and throughout the months of January through June 1946, physically incapacitated for general service, plaintiff was not so incapacitated when he went on active duty in 1942.
At the hearing of July 16, 1958, before the Army Board for the Correction of Military Records no witness was presented by the Army. No one in the Surgeon General’s office has seen or examined plaintiff since May or June 1946.
30. After the hearing, the Army Board for Correction of Military Records entered its conclusions as follows:
1. That although the applicant had ratable service connected disability according to the Veterans Administration Schedule for Rating Disabilities at date of separation, his physical condition was not considered such as to render him permanently incapacitated for continuance on active duty providing his services had been essential.
2. That following a period of hospitalization and observation, the applicant was given a careful physical evaluation subsequent to his terminal examination, and such evaluation on 3 May 1946 considered him not incapacitated for general military service.
3. That although the applicant was retired from his employment with the United States Civil Service in 1947, such a determination does not conclusively establish that he was permanently incapacitated for active *586 military service at date of separation, in 1946, and there is no conclusive evidence of error or injustice in the failure to retire him by reason of physical disability.
The Board recommended:
That in the case of RAYMOND W. BEVINS, his application for correction of military records, dated 12 July 1954, be denied.
31. By a directive dated November 25,1958, Under Secretary Hugh M. Milton, II, acting for the Secretary of the Army, approved the recommendation of the Army Board for Correction of Military Records.
32. Although the physical examinations on induction and for Officers Candidate School in 1942 were negative, and plaintiff was found to be fit for duty and for appointment, plaintiff’s statements in hearings and those made in response to requests for medical history in examinations and medical treatment, and conclusions of doctors, tend to establish that plaintiff had manifested certain nervous and intestinal complaints before his entry into active military service. For example, the following exchange took place during a hearing before the Army Board for Correction of Military Records:
Chaieman. Did you have any nervousness or any nervous trouble before you went in the service?
Applicant. No, sir.
Chairman. The record states that in 1946 you had a special physical in May and that you stated that you had always been nervous.
Applicant. Well, I would say that I was always high-tension, but I didn’t consider it a nervous condition. Chairman. And then there was an abstract from Rhoads General Hospital in June of 1946 in which it said that you had always had nervous tension.
Applicant. I always considered myself a highly — ■ with quite a bit of tension; but I never considered myself having a nervous condition. I mean, in other words, I probably did get a little hepped up about things that probably the average person wouldn’t, like kidding around or something, that I probably didn’t just like to take it like the average person; but I probably considered that high-tension.
On the medical examination for civil service retirement, August 14, 1950, the examining doctor noted that “Patient *587 was always seclusive, sensitive, high strung, and nervous.”
33. Col. Albert J. Glass, an expert medical witness for the defendant, presently Chief Psychiatry and Neurology Consultant to the Office of the Surgeon General, has had the following training and experience: Since graduation in medicine from the University of Maryland in 1932, he has had extensive private and military practice in medicine, following an internship of two years at Gouverneur Hospital in New York City. His private practice from 1936 to 1941 included a residency in neurology at Central Neurological Hospital in New York City, residency in tuberculosis and contagious diseases at Biverside Hospital in New York City, assistant in neurology at Johns Hopkins Hospital, and private practice in Baltimore, Maryland.
Colonel Glass entered military service in 1941, from which time he has performed continuous medical service (except for a period of five months) mainly in the field of psychiatry. He has served at Army hospitals in the United States and overseas. He was Chief Psychiatrist at a hospital in the central Pacific for a year. He went to North Africa in 1943, where he served in several hospitals, and was later Division Psychiatrist in Italy. After returning to the United States, he served at Brooke Army Plospital, Letterman Hospital, and Oliver General Hospital. He was Psychiatric Consultant to the Far East in 1950, 1951, during the Korean hostilities. Upon returning from Korea he became Chief of Psychiatry at Brooke Army Plospital, and then had the same position at Walter Beed Army Plospital. He is now Chief Psychiatry and Neurology Consultant to the Office of the Surgeon General of the Army.
In response to a question as to service incurred neurotic ailment of plaintiff, Colonel Glass stated:
In considering the entire record, including the histories as taken in various hospitals overseas, it is my opinion that this individual had neurotic difficulties for many years, clearly antedating military service. They particularly were manifested by somatic complaints in the abdomen, abdominal pain and distress and complaints of this nature. This condition progressed and it is my feeling that it has continued to progress before, during and after he left the service.
*588 When specifically asked his opinion as to whether plaintiff’s psychoneurotic disorders began in 1941 or 1942, Colonel Glass stated:
From the medical records and statements made under the various histories taken, it is my opinion that his nervousness or nervous disorder began prior to his entrance into military service.
34. Plaintiff was hospitalized in Italy as follows:
Sixty-first Station Hospital, August 17 to September 3,1944. No diagnosis stated.
Twenty-fourth General Hospital, February 19 to March 2, 1945. Diagnosis: Neurosis-gastric.
Thirty-second General Hospital, June 27 to July 6,1945. Diagnosis: Varicosities, anxiety state mild with hypo-chondriasis.
Three-hundredth General Hospital, September 30 to October 4, 1945. Diagnosis: Hypochondriasis-chronic.
Plaintiff was hospitalized in the United States upon his return from Italy as follows:
Rhoads General Hospital, Ithaca, New York, March 4 to May 8,1946. Two operations for varicose veins.
St. Lukes Memorial Hospital, Ithaca, New York, June 9 to July 2, 1947. Inguinal hernia repair, appendectomy. Paid by Veterans Administration.
Mount Park Hospital, St. Petersburg, Florida, November-December 19i50. Emergency exploratory operation for peptic ulcer. Subsequent diagnosis by Dr. Biles: Perforated duodenal ulcer, postoperative.
35. The operations referred to in the preceding finding alleviated or improved plaintiff’s condition to a certain extent, according to the testimony of plaintiff’s witness Dr. Franzoni, in part, as follows:
Q. Let me ask you another question. Does Mr. Bevins continue today to have an ill-defined condition of the gastrointestinal tract manifested by upper and lower abdominal discomfort more marked on the right, intermittent?
A. In part, yes.
Q. I ask you, sir, if he has that exact condition ?
A. No, sir, because he has been in surgery since.
Q. Therefore, it was not permanently incapacitating, was it, sir?
*589 A. He bad symptoms of tbe referable, gastrointestinal tract which were ostensibly permanent which continued until a date which I would have to verify, at which time he had a perforated peptic ulcer.
* # Jfc #
Q. And then there was an operation which eliminated or alleviated that situation; is that correct ?
A. It alleviated or partly compromised it.
‡ ‡ ‡
Q. * * * [W]e cometo the fact that Plaintiff suffered from some what was originally considered to be a circulatory asthenia of some sort which led up and eventuated finally into operation of the ligation of the varicose veins in his legs, and that operation substantially if not entirely cured the condition of varicose veins, did it not?
A. It has substantially corrected the varicose vein condition, yes.
Q. And then the Plaintiff manifested during his service a variety of ill-defined symptoms including epigastric pain, of flatulence, belching, tenderness in the lower right quadrant of his abdomen, a variety of symptoms, I say, which eventuated in two things, the removal of an unusual congenital appendix and, two, the repair of a perforated ulcer, which has resulted largely in the alleviation if not elimination of the symptomotology I referred to; isn’t that correct ?
A. Substantially. I would like to make a point that since the operation particularly for the perforated peptic ulcer there has been apparently a shift of his psycho-neurotic symptoms from a gastrointestinal to the cardiovascular system, and this frequently happens, you remove a man’s focus of a disability and he has to find another one, unconsciously. * * *
Q. Well, you referred to a shift to the cardiac system.
A. In other words, he is more aware of the heart symptoms even though a certain amount of rapid pulse may have been evident on several occasions, for instance, at the time of this Civil Service exam.
Q. * * * This condition of the retrocaecal appendix is just one ailment in his symptoms of preoccupation with his abdominal condition, that is in fact only one; is that correct?
A. Yes, it is one element.
Q. But only one. There are others ?
A. Yes.
*590 Q. Now, if it is true that the surgery which he had following separation from the Army had the effect of changing his mental focus from one area of his abdomen to another, would that mere fact have any basis for a change in your diagnosis of his mental condition as of the 9th of January 1946 ?
A. No, I don’t believe so. I think the basic situation, the anxiety reaction, is subject to specific qualifications because at Rhoads General most of his symptoms seemed referable to the gastrointestinal tract, and we must bear in mind that a surgeon was doing the evaluation. Had he been seen by a psychiatrist at that time the psychiatrist might have paid more attention to his complaint of headaches or weakness or listlessness, a sort of reaction, nightmares, which were more of an anxiety picture.
36. Apparently the focus of plaintiffs psychoneurotic symptoms has been on the cardiovascular system since as early as 1948. As a result, he has researched the problem of his heart, leading, in 1958, to his copyrighted article entitled “BEVINS HEART” as follows:
© Raymond W. Bevins, 1958
A Bevins Heart is a small Heart and there is no impulse on the ventricles just above each breast and below the ribs. Coronary Insufficiency—
Hydrochloric Acid is one of the proper medications.
Prognosis; the heart enlarges causing a structural change thru-out body — By structural change I mean going from an underdeveloped stage into' a development stage — Angina Pectoris—
Caution: All teeth should be drawn before the structural change starts.
In addition to Coronary Insufficiency and Angina Pectoris, there are numerous outlets to his disease including the following: General Weakness, Severe Headaches, Aches and Pains thru-out body, Dizzy Spells, Lack of Tone on the Colon, Constipation, Diarrhea, Mental Manifestations Fear, Nightmares, etc.
37. Defendant’s witness Colonel Glass was questioned at the trial concerning the report of terminal physical examination of plaintiff at Fort Dix, New Jersey, on January 9,1946 (finding 14). He erroneously interpreted “eligible for separation” (item 53) as meaning “fit for duty.” He pointed out an inconsistency in items 52 and 54, stating:
*591 The inconsistency is that on the one hand the man has stated in the box under Item 52 as having a good prognosis, a mild disability, and the note that he is eligible for separation. On the other hand, in Item 54, they mark positively that he is incapacitated for general service and incapacitated for limited service.
As previously indicated, the usual interpretation of the phrase “eligible for separation” at the time it was used with reference to plaintiff’s situation meant that the individual had enough points under the Army’s demobilization plan to be relieved from active duty or returned to the United States if he was still overseas.
38. Defendant’s witness, the psychiatrist Colonel Glass, who was not familiar with all the details of plaintiff’s duties and military service overseas, in testifying generally at the trial, expressed an opinion as to the stress to which plaintiff was subjected during his years of duty in Italy as indicated by the following excerpts from the transcript:
Q. * * * [H]ave you been able to form an opinion as to the amount of stresses involved in such duties, speaking from a psychiatric standpoint ?
$ $ $ $ ‡
A. The amount of stress as compared to other positions both in combat and non-combat positions, he had relatively little stress.
Q. And you base that upon what type of service?
A. He performed the service mostly as a courier from one headquarters to the other, carrying classified documents.
Q. And have you seen any indication in the record as to whether or not he was under the stress of combat conditions ?
A. No.
Q. And you were, you stated, I believe, in an area and were the Division psychiatrist for troops in Italy ?
A. I was, in various parts of Italy, and the last year was as a Division psychiatrist, yes.
Q. And you were able to evaluate the stresses of separate conditions ?
A. Well, we could see where the patients were coming from, what units, what type of problems or responsibilities they had.
Q. So, again, it is your opinion that there was or was not any type of external stress?
*592 A. I would say for an officer this individuáis’ only responsibility was the safeguarding and carrying of records from one headquarters to the other. He had no combat nor did he have the responsibility of command.
On cross-examination. Dr. Glass stated:
Q. Now, Colonel, in passing from his duties prior to going on active duty, with his life and way of carrying on his service and his career in the service, would you say his duties in the Italian area during the time of the war would be more or less strenuous than those in the Post Office?
A. It would be very similar but a different setting.
Q. Would the fact that a war was going on and the fact that he was in a battle area affect your answer?
A. As far as danger is concerned, the implication of danger, I am very well acquainted with the area that he was in. He was as safe as he was at home. *****
Q. * * * [T]he fact that a war was going on and he was in a combat area, without reference to the witness’ special knowledge of the area, some who were in that area at the time may hold an entirely different opinion whether you were as safe as you were at home * * *
Just on those two assumptions, would you want to say there was no more stress in Italy at that time than there would be at the Post Office in Utica, New York?
A. I can only answer your question in view of my experience in the light of receiving psychiatric problems from individuals assigned to various areas. Now, if the predication of psychiatric problems is any criteria of stress, then individuals in the rear combat areas were rarely psychiatric problems.
*****
Q. Colonel, you have testified to the effect that you were somewhat familiar with this Plaintiff’s duties in Italy; is that correct ?
A. Yes.
Q. And you have just testified that you were familiar with his duties in Utica ?
A. Yes.
Q. And you have testified that you know where he was in Italy and were also cognizant of the fact that it was under wartime conditions ?
A. Yes.
*593 Q. Now, would a person sucli as the Plaintiff under these conditions and going on the background which I have just framed-
* * * * *
Q. Be under more or less external pressure in Italy or in Utica, New York?
A. I would say that they would be approximately the same.
The conclusions of Colonel Glass, which, in summary, appear to be: (1) plaintiff could not have been under much stress because he had not actually engaged in combat and did not have the responsibility of command, (2) plaintiff was as safe overseas as he was in Utica, New York, and (3) plaintiff, in the execution of his duties in Italy, would have been under the same stress and pressure as he would experience performing his duties in the Post Office in Utica, New York, are not substantiated by the evidence now of record.
Plaintiff was under no particular stress while on duty in Algiers in 1943 or later while stationed at Sicily from combat conditions, but the nature of his duties and responsibilities was such that he was under some stress at all times. He was, however, under different combat conditions at Naples. In that location plaintiff experienced the stress induced by combat conditions, including bombings, comparable to conditions experienced by a platoon leader in the front line.
39. Plaintiff had varicose veins for a number of years prior to World War II which were described as mild on his induction examination. The condition was progressive and by 1946 both legs were involved. The condition, which was aggravated during military service, was alleviated to a certain extent by surgery in March 1946, but plaintiff still suffers from the condition, and wears elastic stockings at the present time. His current Veterans Administration rating for this disability is 20 percent.
40. Plaintiff returned to the United States and was hospitalized in December 1945 for a head cold (acute laryngitis). The final summary shows that the patient had complete recovery from the condition with mild medication and bed rest, and was ready for duty. A final progress note, *594 dated May 1,1946, made at Rhoads General Hospital, where plaintiff had been hospitalized, indicated that the plaintiff’s illness or condition was on a functional basis; that the plaintiff was advised to continue using the antispasmodic (a drug to relieve spasm of the gastrointestinal tract); and also continue to wear an abdominal support because of hernias; that the plaintiff understood the doctor’s explanation of his condition and appeared willing to accept the explanation, return to civilian life, and attempt to adapt himself to his condition and environment. Plaintiff strongly felt, however, that he should have been given further consultation with an opportunity to appear before a physical evaluation or disposition board prior to his release from active duty. The record supports a conclusion that such procedure was indicated and should have been adopted by the Army authorities.
41. Standing alone, a diagnosis of anxiety reaction, moderate, non-transient, made by the Army at the time of examination for separation from active military service in January 1946, constitutes a ratable disability.[9] It appears, however, from the statements of the examining physicians, that, in their opinion, there was essentially no disability found. They made statements of “disposition, mild, disability, mild, prognosis, good * * * eligible for separation.” In checking-item 54 on the examination report, however, the medical officers indicated that the plaintiff was incapacitated for both general and limited service. This statement is obviously inconsistent with some of the other findings made as a result of the medical examination.
42. Based upon a review of the complete record, it would appear that plaintiff manifested certain nervous, highstrung, or neurotic tendencies for a period of many years. Some of these characteristics existed prior to active military service in 1942, but no notations concerning them were recorded at the *595 time of examination for induction in July 1942 or for Officers Candidate School in December 1942. The nervous system was recorded as normal in both of these examinations. The first complaint of such condition was recorded in 1944 and repeated in 1945, after extended service. Such conditions were usually manifested during active service by somatic complaints of distress, weakness, listlessness, apathy, pain in the abdomen, etc. The evidence supports a finding that any nervous condition which may have preexisted military service, progressed or increased in severity during such service and subsequently. The facts as reflected by the record clearly warrant a finding of aggravation or incurrence, and the Army medical authorities have on a number of occasions determined that plaintiff’s nervous condition was incurred in line of duty. Likewise, the nondisabling varicose veins which were noted at enlistment were aggravated during military service to the extent that surgery became necessary a short time prior to plaintiff’s release from active duty. The condition was not cured and the current rating for varicose veins is 20 percent. Plaintiff has also been assigned a rating of 20 percent for residuals of perforated duodenal ulcer (operated), 10 percent for the neuropsychiatric condition, and 10 percent for hernia. These evaluations result in a combined rating of 50 percent under the appropriate rating schedule.
43. In this case there is a substantial difference of opinion between two expert medical witnesses, both of whom have reviewed the complete medical and employment history of the plaintiff relating to periods before, during, and subsequent to the period of active war service involved. Defendant’s medical witness had never seen or examined the plaintiff, whereas plaintiff’s witness had seen, treated, and observed the plaintiff on occasion and held consultations with another psychiatrist with reference to the plaintiff’s condition.
The final determination arrived at by the Army authorities held that plaintiff had failed to establish entitlement to retirement pay on the basis of his military service. It is establishel by competent evidence that this World War II *596 veteran is at tlie present time permanently incapacitated for any active military service, and there is substantial evidence to support a finding that such incapacity has existed since the date of his separation from active duty, on June IT, 1946.
It is found that the decision of the Army Board for the Correction of Military Eecords, dated July 16,1958, denying plaintiff’s appeal for the correction of his military records, approved by the Acting Secretary of the Army, was arbitrary and not supported by substantial evidence.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in accordance with the opinion, and judgment is entered to that effect.
The amount of recovery will be determined pursuant to Bule 4T (c) (2) of the Eules of this court.

 At the hearing before the Army Board for Correction of Military Records, statements of the Superintendent of Mails and the Foreman at the Post Office, ütica, New York, comprised the only evidence as to plaintiff’s physical and mental condition before he entered into active duty. The evidence is uncon-tradicted that plaintiff was not suffering from any mental or physical defect when he was inducted into the Armed Forces.

 At the hearing before the Army Board for Correction of Military Records, plaintiff testified to the effect that due to the security and crucial nature of the work he was doing, plaintiff was in constant fear that a piece of mall might be lost with the result that at times he actually slept with the mail pouches. At the same hearing Dr. Joseph D. Eranzoni, a psychiatrist testifying In plaintiff’s behalf, was of the opinion that the nature of plaintiff’s duties and the importance he gaye to them could have contributed to his mental condition.

 Plaintiff's medical expert before tbe Correction Board indicated that since plaintiff’s disability had its onset on or about August 17, 1944, he had by this later date begun to focus his tension and anxiety on his gastrointestinal system.

 This second report, which is complete, became necessary after the testimony of plaintiff at a final session of the trial. Counsel for plaintiff was unable to persuade his client to appear and testify until after the first report was filed. This second report will reflect some changes (modifications, additions, omissions) which were considered appropriate based upon the testimony of the plaintiff and a further review of the complete record.

 This finding oí “EPTS” is not supported by the record. The nervous system was recorded as normal in the pre-induction examination in July of 1942 and the same finding made in the examination conducted December 1, 1042, signed by three medical officers. A subsequent examination conducted *569 in May 1946 made a specific finding that this condition was incurred in line of duty.

 The reference to the condition as of October 3, 1945, as “old mild * * * well fixed,” etc., is not consistent with a condition which was first noted in August 1944 and given a final diagnosis of hypochondriasis, moderately severe, only a few days before October 3, 1945.

 The words “eligible for separation” meant that the officer had sufficient points based on length of service, etc., to be eligible for release from active duty under the Army’s demobilization plan.

 The use by medical examiners' of the term “an tll-deflned condition” is a common practice when it is not possible to be more explicit with respect to the diagnosis.

 The percentage evaluation of this condition under the applicable schedule for rating disabilities authorized for use by the Veterans Administration and the Department of Defense would be 10 percent for a moderate condition. However, solely on the basis of the Army records, the Veterans Administration assigned an initial rating of 30 percent, which is the proper evaluation for a moderately severe neuropsychiatric condition under the applicable rating schedule whether it be classified as (1)) neurasthenia, (2) anxiety state, (3) psychasthenia, (4) hypochondriasis, (5) neuroeirculatory asthenia, or (6) psyehoneurosis.